## Mullins v. Mutter.

May 30, 1941.

A. F. Childers and W. W. Barrett for appellant.

Stratton & Stephenson and F. P. Keesee for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellee, Alileen Mutter, recovered a judgment in the Pike circuit court against appellant, Noah Mullins, for the sum of $4,000 in this slander action against him for speaking of and concerning appellant—a young lady who at the time was sixteen years of age—that she was a "G—— D—— whore," and that everybody knew it and he intended to run her out of the place (meaning the business building in which she was then at

work for her aunt and the latter's husband with whom she was then living). From the verdict and the judgment rendered thereon, after defendant's motion for a new trial was overruled, he prosecutes this appeal relying principally on two alleged errors, which are (1) erroneous and improper instructions, and (2) excessive damages. Before disposing of them a brief statement of the facts is deemed necessary.

At the time of the speaking of the slanderous words against plaintiff—which was on April 26, 1939—she was and had been for many years an orphan, both of her parents being dead. Her uncle and aunt, Richard Clark and wife, with whom she was living as a member of their family, resided in a country settlement or village in Pike County, known as "Mossy Bottom," where the defendant also resided. He appears to have owned considerable property and was 73 years of age at the time. A part of the property that he owned was a gasoline station connected with which was a business building with living quarters in the rear all of which was rented and occupied by the Clarks with plaintiff as a member of their family. She performed household duties and when not so engaged assisted in waiting on customers at the gasoline station and patrons of a business operation carried on by the Clarks in the rented business building adjoining and connected with the gasoline station. That business was in part the retailing of soft drinks and, perhaps, beer under a proper permit; but no spirituous liquors were handled. On the evening of April 29, 1939, defendant, two of his grandsons, and a woman by the name of Stewart came to the place of business, where plaintiff was engaged as a salesman for the Clarks, and one of the grandsons ordered some soft drinks which she procured for them, and defendant and his party were preparing to consume their purchase as "chasers" following the consumption of liquor which some of the crowd had brought along.

Plaintiff, according to the evidence, mildly admonished them that it was not only unlawful to drink spirituous liquor in premises so conducted, but also that she had been instructed by her uncle and aunt to not permit the consumption of liquor in their place of business. Immediately defendant became exceedingly angered and reached over the counter in an effort

to assault plaintiff in some manner, during which he declared that he was the owner of the premises in which the business was conducted and if plaintiff did not like his conduct she could get out, and during which time he cursed her and called her a damned whore. Plaintiff then made an effort to leave the building, but defendant intercepted her at the end of the counter and commenced to pull her hair and kick and strike and otherwise assault her, whereby she was considerably bruised and otherwise painfully injured. Nevertheless plaintiff continued her effort to leave the building and in doing so passed the heating stove contained therein, upon the top of which there was a short metal poker about eighteen inches long and from one-half to three-quarters of an inch in diameter. She grabbed it as she passed the stove and while defendant was assaulting her, which he continued to do until she reached the outside door to the building, she then struck him across the head with the poker in order to avert defendant's assaults upon her. Immediately following that occurrence a number of persons, including Mr. and Mrs. Clark, had appeared upon the scene and some of them took hold of defendant and plaintiff's uncle carried her across the street to the residence of a Mrs. James. After entering that place, Mrs. James locked the front door, but defendant continued to curse and abuse plaintiff and to repeat his slander some twenty or more times for nearly an hour before he and the members of his party left the place. He also during that time made strenuous efforts to enter the James residence in order to renew his assaults upon plaintiff, saying at the time that he intended to kill her, etc.

Following the commencement of the assault in the building where plaintiff was working, the loud and boisterous language of plaintiff was heard by Mrs. Clark who had just crossed the street to the home of another neighbor, and she rushed into the building and inquired what the trouble was about by asking: "What does this mean, Mr. Mullins?" He answered: "That God damn bitch over there has gone too far." Plaintiff then said: "Mr. Mullins you tell her the way it was and what I said, I said he called me a God damn whore and I told her, Mrs. Clark, what I said and she told me to go in the back," when defendant again called her a whore. Defendant and his crowd came to the scene in

his truck from his residence located a quarter of a mile distant therefrom. He likewise drove his truck back to his residence when he finally left the scene. The lick on defendant's head with the poker as made by plaintiff produced a flesh wound about one or one and a half inches in length, which caused considerable blood, but no other serious consequences, except the exaggerated claims of defendant. No effort was made by either allegation or proof to show that plaintiff was unchaste or that she bore any such reputation. Some of the witnesses testified that during the disturbance defendant called plaintiff "everything he could think of," which the modesty of the witnesses caused them to appeal to the court to not require them to repeat, except the slanderous words relied on in the petition, and which appeal the court granted.

The story as so briefly related is proven by a number of witnesses, who testified for plaintiff, and is denied by no one—not even by defendant himself. Defendant in testifying in his own behalf—after stating the preliminary facts of the arrival of his group at the place where the difficulty occurred—said: "This girl over here, Alileen I believe is her name—well I know it is from what they said—she said I don't aim to have no drinking in here, said we don't aim to have no drinking in here and I said then after she said that, I said Let's go home, I said some of these days they will have to get out, I will put them out of here, and the first I know then I told them Let's go and so she hit me, that is about all I know * * * After that time I don't know what took place." He stated that he was not drunk, although other witnesses said that he was, but he testified that he had consumed no liquor throughout that day except about a tablespoon full in the early morning thereof. However, he claimed that the lick on his head with the poker benumbed his mind so that he was completely unconscious from that time on and for many hours thereafter following his arrival home, although no doctor attempted to treat his wound until about twenty-four hours thereafter, and he (doctor) testified that such a wound was not calculated to dethrone memory, and especially not until one to two hours following its infliction. The only other witness who testified as to what occurred in the building at the commencement of the difficulty was the Stewart

woman—neither of defendant's grandsons being introduced. But her testimony as to what occurred at that time, and how the difficulty arose, is of no material value, since she claimed her memory was so bad and her attention so unattracted as to make her testimony vague and of no probative force. However, she did say that: "When he came back up he was hit and blood was all running down on him and I heard him say something about a whorish girl but whether it was Alileen he never called Alileen's name that I heard of and whether it was her or somebody else I couldn't say."

It is thus seen that the actualities of the case are —that defendant and his crowd called for soft drinks after entering the building in which plaintiff was at work. They were procured, and some of them produced a bottle of liquor and proposed to drink it in the building when plaintiff—as per instructions from her principals for whom she was working, as well as in the performance of her duty—informed defendant and his crowd that no drinking of spirituous liquors in the building was tolerated. He then became enraged and threatened not only to cancel the lease held on the building by Mr. and Mrs. Clark, but to also put plaintiff out of the building, which threat he immediately attempted to execute by assaulting her and by applying to her the slanderous epithet complained of. When she sought to escape from his wrath, he actually assaulted her by pulling her hair, kicking her on various parts of her body, and otherwise inflicting corporeal punishment to her. In order to be relieved therefrom, and to defend herself, she struck defendant with the poker, following which he continued to repeat his slander and seek out the whereabouts of plaintiff in her temporary imprisonment in the James residence where she had been placed in order to protect her against defendant's continued assaults. The only defense, as we have seen, interposed by defendant as an excuse for his conduct, was a faint and veiled statement, but not carrying with it a denial of what occurred before he was struck with the poker, and from thence forward he claims to have lost his mind entirely and became wholly demented. But such alleged mental condition was completely disproven by all of plaintiff's witnesses testifying in the case, and also by every other witness except defendant himself, including, as we have seen, his phy-

sician. Having recapitulated the evidence we will now turn to a consideration of the alleged errors, which will be considered in the order named.

1. Instruction 1, criticised under this ground, submitted the liability of defendant if he falsely and maliciously spoke of and concerning plaintiff these words: " 'You are nothing but a whore' *or other words of like import and meaning.*" The criticism is directed to the use of the italicized language which this court in a number of cases, one of which is Morris v. Curtis, 45 S. W. 86, 20 Ky. Law Rep. 56, criticized and condemned in actions of this kind, and it is insisted that because of the error in incorporating them in the instruction the judgment should be reversed. But in that case, as well as in others where such language was condemned, there was a clear conflict in the proof as to whether the defendant employed the slanderous language relied on in the petition, or employed other and different and nonactionable language. Therefore, in such a situation the jury might conclude to rest their verdict on the nonactionable language instead of the specific charge made in the petition. But in this case, as we have seen, there is no contrariety in the evidence in any wise contradicting the fact that defendant did on the occasion complained of, and time after time, slandered plaintiff by impugning her chastity with the charge made against him in the petition, and which neither he nor any other witness in the case contradicted. Therefore, it stands undisputed that he did on the occasion complained of slander plaintiff (so far as this record shows) with an unfounded attack upon her chastity. The jury, therefore, could return no other verdict than one finding that he did speak of and concerning plaintiff the slanderous language charged in the petition. We, therefore, conclude that the cases relied on to sustain the criticism now under consideration do not apply to the proven facts in the case, although they would be pertinent where there was a dispute as to what defendant said.

Under this ground it is also complained that the court erred in saying to the jury that only exemplary damages, if any such were found by it, might be mitigated by any provocation that defendant may have had for the speaking of the slander charged in plaintiff's petition. In the first place, it is difficult to discover any

legal provocation on the part of defendant for his alleged assault on plaintiff's character, and his continued repetition of it after she had struck him with the poker —when he claimed to be demented—was the result of his unlawful assault of the plaintiff and a consequence of her effort to defend herself, which clearly made him the author of his condition. Nevertheless if the wound he received at plaintiff's hands actually rendered him unconscious and he thereafter for the first time uttered the slander against plaintiff of which she claims, he would no doubt be excusable and which the court submitted to the jury in an appropriate instruction of which no complaint is made; but if one had been made it would be unfounded. No sustaining authority is cited in support of this particular criticism, although some cases and texts are cited, but when consulted they do not support it.

Criticism is also made of the instructions because the court did not direct a separation by the way of the actual from exemplary damages if any of the latter should be returned; but, like the immediately preceding criticism, no authority is cited in support of the argument. In an effort to substantiate it the text in 25 Cyc. page 421, and the cases of Craig v. Catlet, 5 Dana 323, and Duncan v. Brown, 15 B. Mon. 186, are cited, but a reading of them fails to sustain counsels' argument, since they are to the effect, as stated in the text from 25 Cyc. referred to, that "It may be stated as a general rule that the fact that plaintiff provoked such anger or passion as resulted in the defamatory publication may be shown and considered in mitigation of damages. It is not sufficient, however, that the words were published in anger and passion alone, it must also appear that there was provocation operating as the immediate cause on the part of the person concerning whom the defamatory statement or publication was made." But, as we have seen, plaintiff in this case did nothing to provoke defendant to perpetrate his assaults on plaintiff's character, or on her person, both of which are conclusively shown to have been the result of her objection to him and his crowd drinking liquor in the premises of which she at the time had the temporary charge. Such admonition furnished no grounds whatever for legal provocation, and defendant was not authorized to construe it as such, nor to have his conduct

and words mitigated by any such alleged provocation. The insistence made to the contrary would put it in the power of one to mitigate or excuse his actionable conduct because of an alleged provocation which never occurred. The truth to be gleaned from the entire evidence in the case is that defendant evidently concluded that, since the premises where the transaction happened belonged to him, he had the right to shape his conduct therein according to his own desires, and when a contrary suggestion was made to him by plaintiff he became angry and engaged in the conduct hereinbefore described.

Still another criticism of the instructions is that the court did not submit to the jury the mitigating effect of his intoxication, if any, on the damages to be assessed if any were found in plaintiff's favor. But the trouble with that criticism is—admitting for the sake of argument that intoxication would in law have that effect—(a) that defendant positively stated he was not intoxicated, and (b) that no such instruction was offered by defendant, and for which reason the complaint may not be considered by us, even though it otherwise possessed merit. The above objections cover all of the criticism of the instructions of the court, and each of which we have seen is without merit under the undisputed facts of the case, and which brings us to a consideration of ground (2) relating to the amount of damages assessed by the jury, which we will now proceed to discuss and determine.

2. To begin with all of the authorities, without exception—both text writers and opinions—hold that the amount of damages returned by a jury in libel and slander actions are almost entirely left to the discretion of the jury to be limited only at the point where the amount is so grossly excessive as to clearly indicate arbitrary and prejudicial action on the part of the jury in fixing the amount. The cases also hold that courts in passing upon the excessiveness of damages in such actions consider and take into consideration the facts of each case. If plaintiff is a person of bad reputation to begin with, that fact may be considered, and likewise may his good reputation be considered in determining whether or not the returned damage is excessive. Also the defendant's standing in the community, both socially and financially, may be taken into ac-

count. In this case plaintiff is an orphaned girl, bearing—so far as the record discloses—a good reputation. She was being reared and lived with her aunt and the latter's husband, and apparently discharged her duties well as a member of the household, and in her employed relation of clerk in the business conducted by her aunt. The alleged provocation for defendant's conduct in this case was clearly but a request in the discharge of her duty, not only to her employers, but one imposed by law, i. e., no consumption of spirituous liquors should be permitted upon the premises. At her age the major part of her life is in front of her. Up to the time complained of no breath of suspicion had been leveled against her chastity. But, so emphatically repeated charges by defendant was calculated to leave a scar upon her reputation that might follow her to her grave, which the right of action for slander was extended by the law to reach. It is true that the verdict in this case might be considered somewhat larger than the average one in such cases; but nevertheless, the books are full of verdicts in slander and libel cases far greater in amount than the one returned in this case, one of which is Adams v. Rankin, 1 Duv. 58, where this court, in a slander action involving the same charge as is herein complained of, approved a verdict for $5,000 returned in favor of the slandered female. However, the judgment was reversed, but on the sole error of the allowance of interest contrary to the then prevailing statute on the subject—this court saying: "For this error, and for this only, the judgment is reversed, and the cause remanded, with directions to enter a judgment in conformity with the verdict, omitting interest."

In the case of Dinslor v. Fresh, 2 Ky. Op. 566, this court, through Judge Robertson, refused to grant a new trial in an action the exact duplicate of this one for excessive damages where the jury returned a verdict of $8,000 in favor of the female plaintiff. The judgment, however, was reversed but not for the excessiveness of damages, but because of alleged newly discovered evidence. In view of the latitudinous discretion possessed by the jury in such cases, as approved by all text writers and opinions of courts, we are not prepared to say that the verdict in this case, when considered in the light of the testimony is so excessive as to authorize

a reversal upon that ground alone, and for which reason this alleged error must also be overruled.

Wherefore, for the reasons stated, the judgment is affirmed.